# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | C/A No. 24-01835-EG |
| | Chapter 13 |
| Prentiss Henry Gillis, Jr., | **ORDER** |
| Debtor(s). | |

THIS MATTER is before the Court on the Modified Chapter 13 Plan (the "Plan")[1] filed by Prentiss Henry Gillis, Jr. ("Debtor") and the Objection to Confirmation of Plan (the "Objection")[2] filed by The Bank of New York Mellon ("Creditor") raising issues with the proposed treatment of its claim.  Debtor takes the position that the value of Creditor's collateral—his residence—is lower than the amount of the debt; accordingly, the Plan proposes to bifurcate Creditor's claim into a secured claim to the extent of the value of the underlying collateral and an unsecured claim for the remainder.  The parties agree that, consistent with Fourth Circuit precedent, to the extent that Creditor's claim is undersecured, the proposed modification of the claim is permissible under 11 U.S.C. § 1322(c) because the mortgage loan has already matured.  Thus, the only issue left for the Court to decide is the valuation of the collateral, for which Debtor and Creditor have presented vastly different estimates.

The Court held a contested confirmation hearing on September 24, 2024, at which both Debtor and Creditor were represented by counsel.  The Chapter 13 Trustee ("Trustee") was also present.  At the hearing, Debtor testified as to the condition of his residence and his opinion of its value.  Three exhibits were stipulated to and admitted into evidence.  At the conclusion of the hearing, the Court took the matter under advisement.  Having thoroughly reviewing the record, the evidence presented, the parties' pleadings, and having considered the arguments made at the

---

[1] ECF No. 17, filed July 31, 2024.
[2] ECF No. 11, filed June 13, 2024.

1

hearing while weighing the burden of proof, the Court makes the following findings of fact and conclusions of law[3] and finds that the fair market value of Debtor's residence as of the Petition Date is $74,037.00, thus rendering the Plan confirmable.

### FINDINGS OF FACT

Debtor filed a voluntary petition under Chapter 13 of the Bankruptcy Code on May 22, 2024 (the "Petition Date"). In his schedules and statements, Debtor discloses a one-half interest in real property at 510 McDuffie Street, Bennettsville, South Carolina (the "Residence").[4] Schedule A reflects an estimated total property value of $74,037.00 for the Residence based on the Marlboro County tax assessment. In Schedule D, Debtor lists Creditor as holding a first mortgage on the Residence in the amount of $86,356.45. Based on the tax assessor's valuation, Schedule D lists Creditor's claim as secured in the amount of $74,037.00 and unsecured in the amount of $12,319.45. No other liens on the Residence are reported in Debtor's schedules.

Debtor's first Chapter 13 plan (the "First Plan"), filed on the Petition Date, proposed payments to the Trustee of $2,195.00 per month for 60 months.[5] Part 3.3 of the First Plan provided for the payment of Creditor's $86,356.45 claim in full without valuation, estimating the monthly Trustee payment to Creditor to be $1,793.00. The maturity date of Creditor's mortgage loan is noted as December 14, 2019. In addition, Part 3.3 states that, with respect to Creditor's claim, "Debtor will pay property taxes and insurance premiums outside of the plan, and debtor will make no escrow payments to creditor."

Creditor filed its Objection on June 13, 2024, arguing that the First Plan failed to account for the total debt owed on the matured mortgage loan through the Petition Date, which Creditor

---

[3] To the extent that findings of fact include a conclusion of law, it is deemed a conclusion of law, and vice versa.
[4] ECF No. 1.
[5] ECF No. 3.

2

estimated to be $129,050.63. In the Objection, Creditor also argues that the First Plan impermissibly proposed to de-escrow the mortgage account when Debtor and the co-owner of the Residence had signed an Agreement to Maintain Escrow Account and had not previously requested that Creditor de-escrow the account. Lastly, Creditor asserts that it advanced payments for property taxes and had to force-place insurance on the Residence due to Debtor's failure to provide proof of insurance. Creditor subsequently filed a timely proof of claim, asserting a secured claim in the amount of $127,564.36.[6] Of that amount, the attached itemization lists $24,601.19 owed on the escrow account deficiency for funds Creditor had advanced on insurance and property taxes. Creditor's proof of claim also includes a copy of the Agreement to Maintain Escrow Account, which Debtor signed on February 25, 2009.

On July 31, 2024, Debtor filed a modified Plan, the one currently before the Court, proposing monthly payments to the Trustee of $2,195.00 for two months followed by $1,850.00 for 58 months. Instead of treating Creditor's claim in Part 3.3—the section of the plan form dealing with secured claims excluded from 11 U.S.C. § 506—the modified Plan treats it under Part 3.2: "Request for valuation of security and modification of undersecured claims." There, the estimated amount of Creditor's total claim mirrors the total amount listed in Creditor's proof of claim—$127,564.36—but the portion identified as secured lists the value of the Residence as reported in Debtor's Schedule A—$74,037.00. The Plan's proposed Trustee's monthly payment to Creditor on its claim is $1,537.00.[7]

---

[6] POC No. 8-1.
[7] Part 3.2 of the Plan also includes the same language used in the First Plan to describe Debtor's proposed payment of taxes and insurance premiums outside of the plan without contributions to an escrow account.

3

Creditor did not withdraw its objection; accordingly, the Court ordered the parties to file a joint statement of dispute (the "Joint Statement").[8] In the Joint Statement, the parties stipulated to the admission of all exhibits, which included the 2023 Marlboro County property tax notice and assessment[9] and two certified appraisal reports—one obtained by each party. Debtor contends that the value of the Residence is $65,000.00, based on an appraisal conducted by Jacob Tanner of Pennington + Meadows, LLC ("Debtor's Appraiser") dated as of September 11, 2024 (the "Tanner Report").[10] Debtor also asserts that the value would in no event be greater than $74,037.00—the value assigned to the property by the 2023 Marlboro County tax assessment. On the other end, Creditor argues that the Residence's value is $135,000.00, as determined in the appraisal report prepared by Ronald L. Cribb of Swamp Fox Realty & Appraisals, Inc. ("Creditor's Appraiser") dated as of August 30, 2024 (the "Cribb Report").[11]

The Tanner Report applies a sales comparison approach to reach the value of $65,000.00 for Debtor's Residence. Debtor's Appraiser bases his report on the sales of comparable homes summarized below:[12]

|  | Debtor's Property | Comparable #1 | Comparable #2 | Comparable #3 | Comparable #4 |
|---|---|---|---|---|---|
| Sale Price | N/A | $37,000 | $20,000 | $72,000 | $99,500 |
| Adjusted Sale Price | N/A | $70,540 | $59,420 | $61,760 | $71,100 |
| Price per square foot | N/A | $31.46 | $20.90 | $43.90 | $71.17 |
| Gross living area (square feet) | 1,728 sq. ft. | 1,176 sq. ft. | 957 sq. ft. | 1,640 sq. ft | 1,398 sq. ft. |
| Number of Bedrooms & Bathrooms | 4 bed, 2 bath | 3 bed, 1 bath | 2 bed, 1 bath | 3 bed, 2 bath | 3 bed, 2 bath |
| Distance from Residence | N/A | 0.37 miles NE | 0.42 miles NE | 1.49 miles N | 0.52 miles NW |
| Condition | Fair | Fair/Inferior | Fair/Inferior | Fair | Fair |
| Date of sale | N/A | 9/3/24 | 1/30/24 | 4/9/24 | 3/27/24 |
| Age (yrs.) | 55 | 64 | 84 | 51 | 66 |

---

[8] ECF No. 28.
[9] Admitted at the hearing as Exhibit 1.
[10] Admitted at the hearing as Exhibit 2.
[11] Admitted at the hearing as Exhibit 3.
[12] The information contained in the charts summarizing the Tanner Report and the Cribb Report only provide some of the data relied upon in the respective reports; however, in reaching its decision, the Court considered the entirety of the data and information contained therein.

According to Debtor's Appraiser, the adjusted sale prices for the comparable sales suggested a value range of $59,420.00 to $71,100.00, leading him to conclude that the Residence value under the sales comparison approach was close to the middle of that range at $65,000.00. The report states that Comparables #1, 3, and 4 were adjusted for "site value" and that size adjustments were "based upon $20.00 per square foot." Debtor's Appraiser notes that the cost approach value was omitted from the Tanner Report due to the difficulty of accurately measuring physical depreciation, while the income approach value was omitted because the Residence is not income-producing.

The Tanner Report indicates that the Residence site is in a FEMA-designated Flood Zone AE, a "high risk flood area." Photographs from inside the Residence, included with the report, support Debtor's Appraiser's observations that portions of the ceiling throughout the house show signs of water damage and further noting the presence of standing water in the crawl space. Debtor's Appraiser notes in the Supplemental Addendum to his report that comparable sales #1 and #2 are located in the same FEMA flood zone as Debtor's Residence.

The Cribb Report determined the value of the Residence to be $135,000.00 based on a sales comparison approach. The comparable sales used by Creditor's Appraiser are summarized below:

|  | Debtor's Property | Comparable #1 | Comparable #2 | Comparable #3 | Comparable #4 |
|---|---|---|---|---|---|
| Sale Price | N/A | $132,000 | $129,500 | $141,000 | $119,900[13] |
| Adjusted Sale Price | N/A | $128,500 | $136,000 | $154,100 | $123,600 |
| Price per square foot | N/A | $73.17 | $79.74 | $94.00 | $76.18 |
| Gross living area (square feet) | 1,722 sq. ft. | 1,804 sq. ft. | 1,624 sq. ft. | 1,500 sq. ft | 1,574 sq. ft. |
| Number of Bedrooms & Bathrooms | 4 bed, 2 bath | 4 bed, 2 bath | 3 bed, 2 bath | 2 bed, 2 bath | 3 bed, 2 bath |
| Distance from Residence | N/A | 1.67 miles N | 1.11 miles N | 1.24 miles E | 14.70 miles W |
| Condition | C3[14] | C3 | C3 | C3 | C3 |

---

[13] Given that this comparable was a current listing as of the appraisal date, the sale price reflects the list price, not an actual sale price.
[14] The Cribb Report defines the C3 condition rating as follows:

5

| Date of sale | N/A | 6/24 | 11/23 | 1/24 | Active listing |
|---|---|---|---|---|---|
| Age (yrs.) | 55 | 58 | 58 | 74 | 64 |

The Cribb Report notes that due to the limited number of sales in the area, the distance between all the comparable sales and the Residence was greater than a mile; however, in the opinion of Creditor's Appraiser, they were similar in location and quality. Creditor's Appraiser also assessed the Residence's value employing a cost approach—factoring in the site value, building replacement cost, and depreciation to reach a value of $137,900.00. The Cribb Report, however, notes that the income approach was not considered due to the lack of sufficient rental income data for the relevant housing type.

In describing the condition of the property, Creditor's Appraiser reports that the Residence is "in overall fair condition for age with no major repairs noted." As with the Tanner Report, the Cribb Report notes that the Residence site is in a FEMA Special Flood Hazard Area and that, at the time of inspection, there was flood water present under the home from a recent storm. While Creditor's Appraiser indicated he did not know if any damage occurred due to the flooding, his report acknowledges any damage could lower the value of the Residence. According to the Cribb Report there was no evidence of settlement in the foundation and the pictures of the property did not include any images of water damage or other signs of deferred maintenance. The Cribb Report also did not indicate whether any of the comparables were located in areas with the same or similar risk of flooding as the Residence site.

---

"The improvements are well maintained and feature limited physical depreciation due to normal wear and tear, some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained. *Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation."

Notably, condition ratings C4 and C5 refer to "minor deferred maintenance" and "obvious deferred maintenance," respectively.

6

At the contested confirmation hearing, the parties agreed the only issue left for the Court to decide is the value of Debtor's Residence. Having stipulated to both the Tanner Report and Cribb Report being admitted into evidence, neither party offered testimony from their respective appraisers. The only witness called to testify was Debtor, who was called by his counsel to provide testimony as to the condition of the Residence and his opinion of its value. Debtor testified that he and his sister each inherited a one-half interest in the Residence from their mother. Consistent with the appraisal reports, Debtor stated that the Residence is in a flood hazard area near a creek that connects to Lake Paul Wallace. He testified that his neighborhood has flooded twice so far this year after the lake's dam was breached in May and again in July, requiring Debtor to temporarily leave his home. Debtor opined that the tax assessor's value for the Residence, as reported in his schedules, is accurate, though he thought the value could possibly be less because, according to him, his house is "sinking" as evidence by the cracks seen in its foundation. He further testified that the last repairs made on the home were to the roof and areas affected by water damage in 2019. While Debtor stated that he plans to make repairs to address damage caused by this year's flooding, he testified he had yet to obtain an estimate on the cost of those repairs.

## CONCLUSIONS OF LAW

The issue before the Court is whether Debtor's proposed Plan can be confirmed over Creditor's objection. The Plan treats Creditor's claim as an undersecured homestead mortgage loan and proposes to modify it pursuant to 11 U.S.C. § 1322(c)(2) by bifurcating the claim into secured and unsecured components, while "cramming down" the unsecured component. A mortgage claim secured by a debtor's primary residence generally may not be modified in a Chapter 13 plan; however, section 1322(c)(2) of the Bankruptcy Code provides an exception for a narrow class of homestead mortgages for which the final payment is due prior to a debtor's last

payment under the repayment plan. *Hurlburt v. Black*, 925 F.3d 154, 160 (4th Cir. 2019); s*ee also* 11 U.S.C. §§ 1322(b)(2), 1322(c)(2) (the anti-modification provision and exception, respectively); *In re Smith*, 632 B.R. 297, 299-300 (Bankr. D.S.C. 2021) (applying the Fourth Circuit's holding from *Hurlburt* that the statutory exception to the anti-modification provision of § 1322(b)(2) "permits a chapter 13 debtor to bifurcate undersecured principal residence mortgages that mature prior to completion of the plan payments"). More specifically, section 1322(c)(2) states that, notwithstanding subsection (b)(2):

> [I]n a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.

Here, Debtor uses § 1322(c)(2) as authority to invoke the so-called "cram down" option set forth in 11 U.S.C. § 1325(a)(5)(B). Under that option, "the debtor is permitted to keep the property over the objection of the creditor; the creditor retains the lien securing the claim, . . . and the debtor is required to provide the creditor with payments, over the life of the plan, that will total the present value of the allowed secured claim, *i.e.*, the present value of the collateral . . . ." *Assocs. Com. Corp. v. Rash*, 520 U.S. 953, 957 (1997); *see also Hurlburt*, 925 F.3d at 163-64 (citing *Rash* in noting that the Supreme Court has recognized the "true 'power'" of § 1325(a)(5)(B) stems from it allowing a debtor to strip a secured creditor's lien down to the value of the underlying collateral).

Where an allowed claim is undersecured—that is, the claimed amount exceeds the present value of the property securing the claim—section 506(a)(1) of the Bankruptcy Code "requires the bifurcation of the claim into two components: a secured claim for the value of the collateral, and an unsecured claim for the balance." *In re Price*, 562 F.3d 618, 623 (4th Cir. 2009). Thus, the cram down option in § 1325(a)(5)(B) allows a debtor to limit payment on a secured creditor's

claim to the present value of the underlying collateral and treat the remainder as a separate unsecured claim "paid at the same percentage as general unsecured creditors, and discharged if the plan payments are completed." *In re Eaddy*, No. 15–05744–DD, 2016 WL 745277, at *4 (Bankr. D.S.C. Feb. 23, 2016).

"The ultimate burden of proof regarding a motion to value a secured claim and the confirmation of a chapter 13 plan is on the debtor by the preponderance of the evidence." *In re Lloyd*, No. 18-02936-jw, 2018 WL 6984813, at *7 (Bankr. D.S.C. Nov. 19, 2018); *see also In re Brown*, 244 B.R. 603, 607–10 (Bankr. W.D. Va. 2000) (holding that for an objection to valuation in a proposed chapter 13 plan, the burden is on the debtor by the preponderance of the evidence); *In re Keels*, No. 24-10522-MMH, 2024 WL 3824079, at *3 n.7 (Bankr. D. Md. Aug. 15, 2024) (noting that Debtor bears the burden of proof on valuation for purposes of § 506(a); *In re Maplethorpe*, 569 B.R. 157, 159 (Bankr. E.D. Mich. 2017) (applying the preponderance of evidence standard to a § 506(a)(1) valuation).[15]

The parties do not dispute that Creditor's claim, if it is undersecured, can be modified pursuant to § 1322(c)(2) and any unsecured portion crammed down consistent with § 1325(a)(5)(B), as the mortgage loan is attached to Debtor's primary residence and reached final maturity in 2019. The Fourth Circuit law is clear on that issue. But before the Court can determine whether Debtor's proposed Plan should be confirmed over Creditor's objection, it must first decide what the value of Debtor's Residence is, which will in turn reveal whether Creditor's claim is undersecured and thus subject to the proposed bifurcation and cram down.

---

[15] *But see Eaddy*, 2016 WL 745277, at *4 n.16 (noting disagreement among courts as to whether the burden-shifting analysis applied when determining the amount of an allowed claim in the claim objection context should also apply when issues of valuation arise in the Chapter 13 confirmation context).

This Court has previously recognized the long-held principle that "valuation is 'not an exact science.'" *In re Hayes*, 657 B.R. 519, 528 (Bankr. D.S.C. 2024) (quoting *In re Levin*, No. 8-17-77330-las, 2020 WL 1987783, at *3 (Bankr. E.D.N.Y. Apr. 24, 2020)). As the Court explained in *Hayes*:

> Because the valuation process often involves the analysis of conflicting appraisal testimony, a court must necessarily assign weight in the opinion testimony received based on its view of the qualifications and credibility of the parties' expert witnesses. . . . In bankruptcy cases where the court, acting as the fact finder, is faced with determining the value of a property and is presented with conflicting appraisals, the court has discretion in making its determination and is not bound to accept the values contained in the parties' appraisals; rather, it may form its own opinion of the value of the subject property after considering the appraisals and expert testimony. . . . A court must simply make the best educated guess based on the evidence before it. Even the opinions of experienced and licensed experts . . . are only as good as the assumptions upon which their opinions are build.

*Id.* (citations and internal quotation marks omitted). While Hayes discussed valuation in the context of a § 522(f) motion to avoid a judicial lien, similar principles apply to the valuation sought here for purposes of determining the secured status of Creditor's claim under § 506(a)(1), though with the additional consideration that "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property . . . ." 11 U.S.C. § 506(a)(1); *see also In re Demery*, 623 B.R. 175 (Bankr. M.D.N.C. 2020); *In re Strever*, 468 B.R. 776 (Bankr. D.S.C. 2012). Though courts often rely on expert appraisals that use comparable sales to value residential real property, they may also consider other evidence such as county tax appraisals and opinion testimony from the property's owner. *See Smith*, 632 B.R. at 299 (finding that the opinion testimony from debtor and her husband, as well as a county tax assessment, sufficiently established debtor's proposed valuation of her residence for the purposes of plan confirmation); *In re Broach*, No. 23-03150-hb, slip op. at 4 (Bankr. D.S.C. May 6, 2024) ("Credible testimony need not be equal to expert testimony, but must provide some basis for the Court to find the values justified.");

*Justice v. Pennzoil Co.*, 598 F.2d 1339 (4th Cir. 1979) (holding that "a landowner's opinion concerning the value of his land is certainly admissible").

Here, the Court is limited by the evidence provided: competing expert appraisal reports providing value estimates that are $70,000.00 apart, Debtor's testimony, and the Marlboro County tax assessment. Aside from presenting their respective reports, neither party offered testimony from the experts who prepared their appraisal report. Particularly where two appraisers use the same sales comparison approach[16] and yet reach such different values, it is difficult for the Court to conclude that one report is more accurate or reliable than the other. Without hearing testimony explaining things such as each expert's qualifications, methodology in reaching their conclusion, the proximity of each comparable and whether they are considered to be in the same general neighborhood as the Residence, and the condition of the subject property *vis a vis* the comparable sales used in reaching their conclusion, the Court is left to its own review and interpretation of the appraisals.

Recognizing the limitation both appraisers indicated they had in finding sufficient comparable sales near Debtor's Residence, the Court has concerns with aspects of both appraisal reports. The Tanner Report offered by Debtor includes comparables that are all smaller and, with the exception of one, older than the Residence. While some aspects of the Tanner Report are self-explanatory, other parts raise more questions than they answer. In particular, it is unclear what the rationale is behind certain adjustments made to the comparables' actual sales prices. For example, the report notes that the adjustments made to factor in size differences are based on a set rate of $20.00 per square foot, though no explanation is given for why the appraiser uses that rate, which appears to be below even the lowest price per square foot of all the comparables. The report also

---

[16] As noted previously, Creditor's Appraiser also utilized the cost approach, but there was little difference between the values he determined under that approach and the sales comparison approach.

notes that the sales prices for Comparables #1, 3, and 4 were adjusted for "site value" but doesn't explain whether those adjustments are meant to account for differences in the square footage of each site, the location of each site, both, or some other measure.  Additionally, only one exterior photograph is provided for each comparable, making it difficult to fully assess whether they are in better or worse condition than the Residence.  From their pictures, Comparables #3 and #4, which are not located in the same flood zone as the Residence, appear to be in better condition than Debtor's home.  Comparable #2, with an adjusted sale price of $59,420.00 and a price per square foot of $20.90, appears to be an outlier among the other comparables.  From its picture, Comparable #2 looks to be in much worse condition than the Residence, and its sale took place in January 2024, making it one of the oldest comparables between the two appraisal reports.  If the Court disregards Comparable #2, the only comparable left that is located in the same flood zone as the Residence is Comparable #1, which is also the closest comparable to the Residence and has an adjusted sale price of $70,540.00.  Moreover, the average price per square foot without Comparable #2 would be about $48.84, which results in a value of $84,401.28 when multiplied by the square footage of the Residence's gross living area, though that still factors in the comparables located outside of the Residence's flood zone.

The Cribb Report offered by Creditor also appears to raise unanswered questions and presents issues making its reliability questionable at best.  Not only does the report not include any pictures or notes of the water damage to the ceiling or roof as the Tanner Report does, but Creditor's Appraiser also indicates that he did not know if any damage had occurred from flooding and storm conditions. Creditor's Appraiser acknowledges that any such damage could change the Residence's value.  Like the Tanner Report, the Cribb Report only provides one exterior photograph of each comparable property, limiting the extent to which the apparent condition of the

12

comparables can be compared to the Residence.  Based on those pictures and the condition ratings provided, it seems that the comparables Creditor's Appraiser relies on are all in better condition than the Residence.  The pictures provide in the Tanner Report and Debtor's testimony regarding the water damage to his home suggest that the condition rating Creditor's Appraiser assigned to the Residence underestimates the extent of deferred maintenance required.  In addition, the Cribb Report does not indicate whether any of the comparables are located in the same flood zone as the Residence or experience a similar risk of flooding.  Lastly, comparable #4 appears to be an outlier given that it is over 14 miles away from the Residence and its "sale price" is actually the listed asking price rather than an actual sale price.

Given the issues with the competing expert appraisals, the Court gives more weight to the county tax assessment and Debtor's testimony.  The pictures from the interior and crawl space of the Residence, as well as Debtor's testimony regarding the extent of water damage and the deferred repairs needed, suggest that Creditor's Appraiser's value of the Residence is too high while the confusing adjustments to sales prices and dissimilarities between the comparables and the Residence in the Tanner Report suggests that Debtor's Appraiser's valuation is too low.  Thus, based on the appraisals presented and Debtor's testimony, the tax assessment value falling between the two appraisal report values provides the best available estimate of the Residence's value.  At the hearing, Debtor opined that the tax assessment value for the Residence, as reported in his schedules, is accurate, though he believed the value could possibly be less due to the damage inflicted by flooding after the assessment date, and Creditor's Appraisal did not sufficiently rebut that testimony.  Accordingly, the Court finds that the value of the home for purposes of valuing Creditor's claim is $74,037.00.

**IT IS THEREFORE ORDERED** that the Court finds the present value of Debtor's Residence as of the Petition Date to be $74,037.00. Based on such valuation and assuming there are no other issues to be resolved, the Trustee shall file a recommendation regarding Debtor's Plan filed on July 31, 2024 within ten (10) days of the entry of this order.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**10/04/2024**



Entered: 10/04/2024

Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina